## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

AMY TEBLUM and DARYL TEBLUM,
individually,

   Plaintiffs,

v.            Case No: 2:20-cv-547-JLB-MRM

THE CITY OF CAPE CORAL CHARTER
SCHOOL AUTHORITY, a Public Body
Corporation, a/k/a City of Cape Coral,
Florida,

   Defendant.

_____

## <u>ORDER</u>

  Defendant, the City of Cape Coral Charter School Authority ("Authority"),

moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs Amy and

Daryl Teblums' ("the Teblums") Second Amended Complaint ("the Complaint") for

failure to state a claim.   (Doc. 11.)   Under 42 U.S.C. § 1983, the Teblums allege

violations of their First Amendment right to protected speech (Counts I and III),

with Mrs. Teblum also alleging a violation of her right to freedom of intimate

association (Count II).   (Doc. 3.)   They claim that the Authority retaliated against

them for their protected speech critical of the Authority and its employees.   But the

Authority maintains that the Teblums' protected speech claims fail as a matter of

law because they spoke neither as private citizens nor on matters of public concern.

It also contends that the Teblums have not alleged facts establishing that the

Authority had a widespread unconstitutional practice or custom for liability under section 1983.

Although the Authority raises important points that will ultimately determine the outcome of this dispute, the Court lacks an adequate factual record to definitively address these issues at this early stage. Because the Teblums have sufficiently pleaded facts to support their claims, the Court **DENIES** the Authority's motion to dismiss (Doc. 11).

## BACKGROUND[1]

Between 2015 and 2016, Mrs. Teblum worked for the Authority as an Exceptional Student Education ("ESE") teacher at Christa McAuliffe Elementary School ("Christa"). (Doc. 3 at 2.) Her husband, Mr. Teblum, served as a member of the Authority's voluntary board ("Board"), and their daughter attended Christa. (Id.) During this time, Mrs. Jacquelin Collins was Christa's principal, and Mr. Nelson Stephenson was the Authority's superintendent. (Id.) For clarity, the Court begins with the facts pertaining to Mr. Teblum before summarizing the same for Mrs. Teblum.

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1274 n.1 (11th Cir. 1999) (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir.1998)). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this standard, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A.    **Mr. Teblum**

Mr. Teblum was appointed to the voluntary Board by the Cape Coral City Council.  (Doc. 3-1, Ex. A.)   Over the course of one year, Mr. Teblum documented and reported "well over two dozen administrative violations," mostly attributable to Mrs. Collins.   (Doc. 3-2, Ex. B.)   According to a January 11, 2016 email that Mr. Teblum sent from his private Gmail account to Mr. Stephenson, Mr. Teblum first reported violations to Mr. Stephenson on January 18, 2015.   (Id.)   Specifically, he reported that Mrs. Collins had "abandoned" Christa's campus with neither an administrator nor a school resource officer on the campus to address "emergency, disciplinary[,] or other issues."   (Id.)   In August 2015, he informed Mr. Stephenson that Mrs. Collins knowingly presented the Board with inaccurate information about Christa's budget for the upcoming school year, and he insisted she abide by her originally proposed budget.   (Id.)   Mr. Teblum tried discussing his concerns with Mrs. Collins by email but was met with threats and intimidation concerning his wife and daughter—a student at Christa.   (Id.)   Mr. Teblum forwarded these threatening communications to Mr. Stephenson so Mr. Stephenson "could protect our staff and students from the actions of their principal."   (Id.)

At a December 2015 Board meeting, Mr. Teblum and fellow Board members approved an overnight field trip to the Kennedy Space Center.   Based on the information Mrs. Collins provided the Board, the Board believed the entire fifth-grade class would attend this trip.   (Id.)   Only after the Board approved this trip did Mrs. Collins email the Board and clarify that only students in Christa's

accelerated classes would attend the overnight trip.   (Doc. 3-1, Ex. A.)   Mr. Teblum pointed out that this decision contradicted the information Mrs. Collins provided the Board.   (Id.)   He expressed his frustration with this repeated lack of transparency and stated that the misinformation was hurting Christa's public reputation.   (Id.)[2]   Mrs. Collins replied that Mr. Teblum was the only individual making an issue of this, and that his daughter attending Christa created a conflict of interest.   (Id.)   At this, Mr. Teblum replied that Mrs. Collins's repeated actions were harming the Authority's reputation, particularly Christa's, and that he did not appreciate her constantly mentioning his wife and child.   (Id.)

Mr. Teblum publicly raised the above issues at a January 2016 Board meeting but was met with public humiliation and insults from fellow Board members and staff.   (Doc. 3 at 4.)   Two months later, at another Board meeting, a Christa teacher publicly read a statement directed toward Mr. Teblum.   (Doc. 3 at 4; Doc. 3-3, Ex. C.)   The statement, which 30 other teachers signed, explained that Mr. Teblum's actions at the January Board meeting embarrassed and concerned Christa's teachers, potentially harmed the school's public image, and unfairly targeted Mrs. Collins.   (Id.)

On March 11, 2016, only a few days after that statement's reading, Mrs. Teblum was transferred from Christa to a different elementary school.   (Doc. 3 at

---

[2] Later, Mr. Teblum explained to Mr. Stephenson that this decision excluded 80–100 non-accelerated students from the trip whom the accelerated students were now bullying because the non-accelerated students "weren't smart enough" to attend.   (Doc. 3-2, Ex. B.)   He characterized Mrs. Collins's decision as "blatant discrimination" against the non-accelerated students.   (Id.)

4.)   Mr. Teblum characterized this transfer as the Authority unlawfully retaliating against him, through his wife, for his criticism of Mrs. Collins.   (Id.)   He then informed Mr. Stephenson that he was in the process of requesting a formal investigation into Mrs. Collins's retaliation.   (Doc. 1-1, at 23.)   At the end of March, the Authority removed Mr. Teblum from the Board.

**B.   Mrs. Teblum**

A few weeks before her transfer from Christa, on February 24, 2016, Mrs. Teblum discovered an issue with one of her ESE students.   Mrs. Teblum "was responsible for managing" this student's "case" and "ensuring that" the student received "legally mandated services and accommodations."   (Doc. 3-5, Ex. E.) Even though the "Authority is contracted to provide" these services and accommodations, Mrs. Teblum learned that the student "was NOT [sic] receiving them."   (Id.)   She approached the teacher responsible for providing these accommodations, but the teacher told Mrs. Teblum she was simply too busy to provide them.   Mrs. Teblum then discovered that other ESE students also were not receiving similar accommodations at the school.   She reported these violations to Mrs. Collins, but Mrs. Collins took no action.   (Id.)

As for her transfer, Mrs. Teblum explains that, initially, Mrs. Collins told her that Mr. Stephenson ordered the transfer for Mrs. Teblum's benefit considering the conflict between Mrs. Collins and Mr. Teblum.   (Id.)   But later, Mrs. Teblum's former colleagues informed her that Mrs. Collins revealed at a Christa staff meeting she herself had transferred Mrs. Teblum, hoping to improve the working

environment at Christa.  (Id.)  Mrs. Teblum believed that Mrs. Collins's actions were because of her husband's criticism of Mrs. Collins.  (Id.; see also Doc. 3 at 6.)

Finally, Mrs. Collins's targeted harassment of Mrs. Teblum eventually led to Mrs. Teblum's termination.  About a week after Mrs. Teblum's transfer, she learned that her teaching certificate was no longer compliant.  (Doc. 3-5, Ex. E.) While Mrs. Collins could have raised this sooner, she waited until Mrs. Teblum's transfer in 2016 before informing Mr. Stephenson of this issue.  (Id.)  Now, Mrs. Teblum faced the possibility of demotion or termination if she could not remedy her certificate in a short amount of time.  Ultimately, the Authority did not renew her employment for the following school year.  (Doc. 3 at 5.)  And even after Mrs. Teblum left the Authority, Mrs. Collins continued retaliating against her by misfiling information about her teaching certificate.  (Id. at 10.)

Against this backdrop, the Teblums bring their lawsuit.  In Counts I and III, they argue that the Authority took the above adverse actions against them because of their protected speech criticizing Mrs. Collins and the Authority.  (Doc. 3 at 6–7, 9–10.)  Mr. Teblum claims that the temporal proximity between his comments at the January 2016 Board meeting and the Authority's transfer of Mrs. Teblum in March 2016 shows that his statements caused the transfer.  (Id. at 6.)  Mrs. Teblum also claims that the Authority acted against her, in part, because of Mr. Teblum's comments, thereby violating her right to intimately associate with her husband (Count II).  (Id. at 8.)  In addition, Mrs. Teblum claims the Authority

retaliated against her because she reported violations concerning an ESE student.[3] The Teblums claim the Authority's actions caused their loss of government benefits (e.g., healthcare through Mrs. Teblum's employment) and government wages (e.g., Mrs. Teblum's salary).   (Id. at 7.)   The Authority has not answered the Complaint and instead moves to dismiss.   (Doc. 11.)

## DISCUSSION

The Authority argues that the "Complaint fails to state a claim for violation of the First Amendment because a governmental employee's speech is not protected when the speech arises from the employee's job responsibilities."   (Doc. 11 at 2.) In support, the Authority relies on the First Amendment analysis for public employees set forth in Pickering and later refined by Garcetti and its progeny.[4] Before the Court can reach the merits of the Authority's motion, it must first address the applicability of Pickering and Garcetti.

## I.   The Complaint Alleges Facts Which State a First Amendment Claim

The Government's regulation of its employees' speech differs from its regulation of the speech of ordinary citizens.   Connick v. Myers, 461 U.S 138, 140 (1983); Pickering, 391 U.S. at 568.   When the Government acts as an employer, it has broad discretion in its employment decisions.   Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996).   But Mr. Teblum maintains that the Authority's argument

---

[3] Florida law requires that students with developmental disabilities receive specialized instruction as part of an ESE program.   See Fla. Stat. § 1003.57.

[4] Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Garcetti v. Ceballos, 547 U.S. 410 (2006).

directed at him on this point "utterly misses the mark in its protected speech analysis" (Doc. 13 at 5) because he "was not an employee of the Board and thus, . . . was speaking as a member of the public" (Doc. 3 at 6).[5]

The obvious problem here is that <u>Garcetti</u> rests on the assumption that a public <u>employer</u> cannot force a public <u>employee</u> to choose between his constitutional rights or his livelihood.   547 U.S. at 419 ("[P]ublic employer" cannot "<u>leverage the employment relationship</u> to restrict" employee's free speech (emphasis added)).[6] Nevertheless, some courts have found that "the opportunity to serve as a volunteer constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment Scrutiny."   <u>Hyland v. Wonder</u>, 972 F.2d 1129, 1135 (9th Cir. 1992), <u>cert. denied</u>, 508 U.S. 908 (1993).   Based on this assumption, others have reasoned that "similar First Amendment concerns would apply in a volunteer context."   <u>Versarge v. Township of Clinton N.J.</u>, 984 F.2d 1359, 1364 (3rd Cir. 1993)

---

[5] The Court notes that neither party has helpfully briefed this issue.   The Authority, while recognizing Mr. Teblum's voluntary position (Doc. 11 at 2), immediately launches into its analysis of public employee speech without discussing what effect—if any—Mr. Teblum's status as a <u>volunteer</u> has on that analysis.   For their part, the Teblums' response flatly states, "Mr. Teblum was not an employee of the Defendant.   [] Thus, the authorities cited by the Defendant do not apply."  (Doc. 13 at 5.)   Otherwise, they offer nothing more by way of discussion or caselaw.   The City of Cape Coral's Code of Ordinances states, "No member of the Board will be an employee of the Authority or receive any financial benefits from the operation of the charter school(s)."   Cape Coral, Fla., Code § 26-6(c) (2016).   But for reasons discussed below, this is not dispositive.   Should the parties raise this argument later in this litigation, they should both develop the record and meaningfully brief this issue for the Court's consideration.

[6] To be certain, applying a public employee protected speech analysis would not be wholly unreasonable when the Complaint itself alleges that Mr. Teblum "lost government benefits wages and benefits [sic]."   (Doc. 3 at 7.)   That allegation implicates both Mr. Teblum's livelihood, to an extent, and his right to free speech.

(citing <u>Hyland</u> and applying "an analysis typically used in a government employment context—the <u>Pickering</u> balancing test" to volunteer firefighter's First Amendment retaliation claim); <u>see also</u> <u>Rodin v. City of Coral Springs</u>, 229 F. App'x 849, 855 (11th Cir. 2007) (applying <u>Pickering</u> balancing test to volunteer firefighter who was "not a paid city employee").   But the Court need not—and indeed, considering the unfledged record before it, should not—wade into this quagmire to resolve this motion to dismiss.   Even if the Court assumes that <u>Pickering</u> and <u>Garcetti</u> apply to Mr. Teblum, the Complaint nevertheless states a claim.[7]

## II.    The Teblums' Protected Speech Claims (Counts I & II)

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment."   <u>Alves v. Bd. of Regents</u>, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing <u>Bryson v. City of Waycross</u>, 888 F.2d 1562, 1565 (11th Cir. 1989)).   Under <u>Garcetti</u>, to survive the Authority's motion to dismiss, the Teblums' Complaint must allege sufficient facts which show that they spoke: (1) as private citizens; and (2) on matters of public concern.   <u>See</u> <u>Boyce v. Andrew</u>, 510 F.3d 1333, 1342 (11th Cir. 2007) (citing <u>D'Angelo v. School Bd. of Polk Cnty.</u>, 497 F.3d 1203, 1209 (11th Cir. 2007)).

### A.    The Speech as a Private Citizen or Public Employee Requirement

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the

---

[7] This conclusion is limited solely to the facts of this case, at this procedural stage.

Constitution does not insulate their communications from employer

discipline." Garcetti, 547 U.S. at 421.   "The central inquiry is whether the speech

at issue 'owes its existence' to the employee's professional responsibilities." Moss v.

City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir. 2015) (quoting Garcetti, 547

U.S. at 421.   The Supreme Court has explained that "[t]he critical question under

Garcetti is whether the speech at issue is itself ordinarily within the scope of an

employee's duties, not whether it merely concerns those duties." Lane v. Franks,

573 U.S. 228, 240 (2014) (emphasis added).   After Lane, unprotected speech that

owes its existence to an employee's professional responsibilities is speech "that an

employee made in accordance with or in furtherance of the ordinary responsibilities

of [his or her] employment, not merely speech that concerns [those]

responsibilities." Alves, 804 F.3d at 1162.

> ### B.    The Public Concern Requirement

"The second requirement—that the speech address a matter of public

concern—concerns the context of the speech and asks whether the employee spoke

on a matter of public concern or on matters of only personal interest." Alves, 804

F.3d at 1162 (citing Boyce, 510 F.3d at 1342–43).   For speech to touch upon a

matter of "public concern," it must relate to "any matter of political, social, or other

concern to the community." Connick, 461 U.S. at 146.   The analysis turns on "the

content, form, and context of a given statement, as revealed by the whole

record." Id. at 147–48.   "[A]n employee's speech will rarely be entirely private or

entirely public." Akins v. Fulton Cnty., 420 F.3d 1293, 1304 (11th Cir. 2005)

(quoting Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993)).   A court must look to

"whether the 'main thrust' of the speech in question is essentially public in nature or private." <u>Vila v. Padron</u>, 484 F.3d 1334, 1340 (11th Cir. 2007) (quoting <u>Mitchell v. Hillsborough Cnty.</u>, 468 F.3d 1276, 1283 (11th Cir. 2006)).

### C.   A Summary of <u>Alves</u>

On both prongs of <u>Garcetti</u>, the Authority relies almost exclusively on <u>Alves</u> as "on point and dispositive of Plaintiffs' claims." (Doc. 11 at 8.)   There, the Eleventh Circuit held that a group of psychologists airing grievances about their employer spoke as employees, not private citizens, so their First Amendment retaliation claims failed on summary judgment.   804 F.3d at 1163.   The psychologists worked for a University of Georgia clinic and penned a memorandum to the University detailing several problems the psychologists had with a new doctor in charge of running the clinic.   <u>Id.</u> at 1155–56.   Soon after they wrote this memorandum, the University fired the psychologists.   <u>Id.</u> at 1158.   The psychologists argued that their speech was private, in part, because their job duties did not require them specifically to write and submit the memorandum.   <u>Id.</u> at 1163.

The Eleventh Circuit, quoting <u>Garcetti</u>, 547 U.S. at 424–25, first reasoned that "formal job descriptions 'often bear little resemblance to the duties an employee actually is expected to perform'" and instead applied a "functional review."   <u>Id.</u> at 1164 (citing <u>Abdur-Rahman v. Walker</u>, 567 F.3d 1278, 1285 (11th Cir. 2009)).   Next, the court summarized each psychologist's work-duties—including specific tasks—and compared those responsibilities with the memorandum's

allegations.  Id.   The court concluded that the group wrote the memorandum "in the course of performing—or, more accurately, in the course of trying to perform— their ordinary roles as" employees.   Id. (emphasis in original).   The court's holding was premised on its finding that "[e]ach complaint in the Memorandum was made in furtherance of their ability to fulfill their duties with the goal of correcting [the new doctor's] alleged mismanagement, which interfered with [the group's] ability to perform" their jobs.   Id. 1164–65.   Accordingly, the Eleventh Circuit reasoned that the psychologists did not speak as private citizens, but rather as public employees.

And while the Alves court's inquiry could have stopped there, it nevertheless continued its analysis and determined that the group also did not speak on matters of public concern.   The court began by noting that "[a]fter Connick, 'courts have found speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection.'"   Alves, 804 F.3d at 1166 (quoting Maples v. Martin, 858 F.2d 1546, 1552 (11th Cir. 1988)).   Then, the Eleventh Circuit reviewed the memorandum's specific grievances.   To summarize, the Eleventh Circuit determined that although the memorandum "touched upon" matters of public concern (e.g., the counseling services the clinic provided the public), the main purpose was to express the group's "private employee grievance[s]" against management.   Id. at 1167.   That the group and University provided public services did not change the fact that the memorandum largely failed to address issues concerning the public; instead, it concerned the psychologists' own frustrations about their roles as employees.   See id.

### D.   <u>Alves</u> Is Distinguishable

> **1.   The Complaint Alleges that the Teblums Spoke as Private Citizens**.

To begin, the Court agrees with the Teblums that <u>Alves</u> is distinguishable from their dispute on procedural grounds alone; the Eleventh Circuit and district court in <u>Alves</u> had the benefit of a developed summary-judgment record with specific job duties to assist their analysis.   Here, the Court does not enjoy the same luxury.   Moreover, the issue before the Court is whether the Teblums have properly <u>pleaded</u> their First Amendment retaliation claims, not whether they will <u>succeed</u> on those claims.

For example, it is unclear whether Mr. Teblum, as a Board member, had a duty to "keep accurate records" of "administrative violations" occurring at one of the Authority's elementary schools and then <u>report</u> those violations to the Authority's superintendent.   Nor is it clear how Mr. Teblum's complaints about Mrs. Collins abandoning Christa or causing the harassment and bullying of students furthers his own duties as a Board member.   The Court can reasonably infer that Mr. Teblum, as a Board member, is not personally responsible for the individual well-being of the Authority's students.   And without a specific showing from the Authority, the Court neither agrees that Mr. Teblum's speech necessarily "owes its existence" to his professional responsibilities, nor that his speech was made "in furtherance of [his] ability to fulfill [his] duties" as a Board member.   <u>Alves</u>, 804 F.3d at 1164.

For similar reasons, the Court finds that the Complaint sufficiently alleges Mrs. Teblum also spoke as a private citizen.   The Complaint states that when Mrs.

Teblum approached another teacher, Mrs. Teblum learned that "other students were not receiving their mandated accommodations under the same classroom teacher."   (Doc. 3-5, Ex. E.)   After Mrs. Teblum confirmed this, she reported <u>all</u> these violations to Mrs. Collins.   Beyond her one, specific student noted above, nothing in the Complaint suggests Mrs. Teblum was supposed to ensure <u>all</u> ESE students received their accommodations.   There is also no indication that Mrs. Teblum, for example, managed a group of ESE teachers at the school so that her duties included reporting <u>another</u> teacher's failure to provide accommodations to ESE students Mrs. Teblum was not overseeing.   To conclude otherwise, the Court would need to draw an adverse inference from the limited record against Mrs. Teblum, which would defy the standard this Court must employ in deciding a rule 12(b)(6) motion.

### 2.    The Complaint Alleges that the Teblums Spoke on Matters of Public Concern.

The Complaint also alleges facts which show Mr. Teblum's speech went beyond issues of personal grievances or matters relating to the Authority's internal administration.   For example, accepting the allegations in the Complaint as true, Mr. Teblum did not question Mrs. Collins's lack of transparency and misconduct solely for their impact on the Teblums.   Mr. Teblum desired to address these issues as "the reputation of ([the Authority]) [was] at stake in a public forum."   (Doc. 3-1, Ex. A.)   He tried resolving these issues "internally instead of air[ing them] in a public forum as this would cause harm to the system and specifically Christa." (<u>Id.</u>)   And despite having a daughter at Christa, Mr. Teblum never once mentions

her outside the context of Mrs. Collins's threats.   Instead, his speech focused on how Mrs. Collins's actions—abandoning her campus and limiting attendance for the field trip—affected the student body at large.   These allegations suffice at the pleading stage.   See Maples, 858 F.2d at 1553 (finding that while an employee's speech was critical of department head's management style, it also involved "substantive issues that could influence the public's perception of the quality of education provided by the [d]epartment").

The Complaint also alleges that Mrs. Teblum's speech did not merely "touch up against matters of public concern," but was rather "directed at such concerns."   Alves, 804 F.3d at 1167; see Maples, 858 F.2d at 1553 ("[F]ailure to execute federally mandated programs for handicapped students is issue of public concern." (citing Southside Pub Schs. v. Hill, 827 F.2d 270, 273 (8th Cir. 1987))). Mrs. Teblum did not assert "a private grievance respecting employment or working conditions" when she informed Mrs. Collins that several ESE students were not receiving legally mandated accommodations.   Hill, 827 F.2d at 273 (citing Connick, 461 U.S. at 147).   As opposed to a personal detriment, the Complaint alleges that Mrs. Teblum was responsible for only one ESE student who did not receive their accommodation.   (Doc. 3-5, Ex. B.)   But Mrs. Teblum also reported that several other students, under the control of another ESE teacher, were not receiving statutorily required accommodations.   "Surely such a shortcoming is to be regarded as a legitimate area of public concern."   Hill, 827 F.2d at 273–74.   At bottom, the Authority has not shown that the "purpose" of Mrs. Teblum's speech was to further

her <u>own</u> private interests rather than raising issues of public concern.   See <u>Morgan</u>,
6 F.3d at 754.

For these reasons, the Teblums have met their burden in stating their claims.
The Complaint contains sufficient factual allegations from which, when taken as
true, the Court can infer that both husband and wife not only spoke as private
citizens, but that they also spoke on matters of public concern.   This finding simply
means that the Teblums may litigate those claims.   Whether they ultimately
succeed on the same is another matter entirely.

## III.   Mrs. Teblum's Freedom of Association Claim (Count II)

In Count II, Mrs. Teblum alleges that the Authority retaliated against her for
her husband's speech, thereby violating her right to intimately associate with Mr.
Teblum under the First Amendment.   (Doc. 3 at 8.)   "To show that a public
employer has impermissibly burdened or infringed a constitutional right," Mrs.
Teblum "must first demonstrate that the asserted right is protected by the
Constitution—which . . . the right to freedom of intimate association is—and that []
she suffered adverse action for exercising that right."   <u>Gaines v. Wardynski</u>,
871 F.3d 1203, 1212–13 (11th Cir. 2017).   The Authority advances no new
argument specific to this issue and instead relies on the same contentions it raised
against Counts I and II, above.   (<u>See</u> Doc. 11 at 10 n.1.)   And because the Court
has already rejected those arguments, the Authority's argument here must also
fail.[8]

---

[8] In any event, the Authority's argument fails for at least one other reason.   The

**IV.     The Teblums' Municipal Liability Allegations**

"All charter schools in Florida are public schools and shall be part of the state's program of public education."   Fla. Stat. § 1002.33(1).   The Authority is a public corporate body which exercises "public and governmental functions, [] for public purposes, and [its powers and duties] are matters of public necessity."   Cape Coral, Fla., Code § 26-15(a) (2016).   Like any sub-state public entity, the Authority "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."   Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).   Instead, the Authority must have "officially sanctioned or ordered" the violation of the Teblums' First Amendment rights.   Mandel v. Doe, 888 F.2d 783, 791 (11th Cir. 1989) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)).

The Board is the policymaker for the Authority: "The powers of the Authority shall be exercised through a governing [B]oard . . . and which shall provide governance of the charter schools."   Cape Coral, Fla., Code § 26-2 (2016).   Thus, a single decision by the Board may constitute Authority policy, even if that decision is not a formal policy.   See Cuesta v. Sch. Bd., 285 F.3d 962, 968 (11th Cir. 2002) ("Even in the absence of an express policy or custom, a local government body can

---

Authority seems to argue that Mr. Teblum's speech must satisfy Garcetti for Mrs. Teblum to maintain her intimate association claim.   (See Doc. 11 at 10 n.1.)   In D'Angelo v. School Board of Polk County, the Eleventh Circuit held that Garcetti "requires [] public employees to have engaged in associational activity as citizens to be protected under the First Amendment."   497 F.3d 1203, 1212 (11th Cir. 2007) (emphasis added).   But the subject matter of a public employee's associational activity "need not be on matters of public concern to be protected under the First Amendment."   D'Angelo, 497 F.3d at 1212.

be held liable 'for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.'" (quoting <u>McMillian v. Johnson</u>, 88 F.3d 1573, 1577 (11th Cir. 1996))).

## A.    Mr. Teblum's Municipal Liability Allegations

Mr. Teblum alleges that the Authority "retaliated against" him when it "ultimately removed him from the Board."   (Doc. 3 at 6.)   And, as noted, the Authority is liable—even for single acts—of its policymakers (e.g., the Board).   <u>See Cuesta</u>, 285 F.3d at 967–68; <u>K.M. v. Sch. Bd.</u>, 150 F. App'x 953, 957 (11th Cir. 2005) ("Because Florida law identifies the School Board as the policymaker for the School District, <u>a single decision</u> by the Board may constitute School Board policy, even if not phrased as a formal policy statement." (emphasis added)).

While the Complaint does not allege specifically how the Authority removed Mr. Teblum, the most favorable construction of the Complaint is that the Board voted to remove him.   This is because the Board itself had "final policymaking authority . . . in the area of the act or decision" to remove Mr. Teblum.   <u>McMillian</u>, 88 F.3d at 1577.   And because the Court must infer that the Authority removed Mr. Teblum for his comments criticizing itself and Mrs. Collins, Mr. Teblum has sufficiently pleaded the Authority's liability under section 1983.   <u>See Pembaur</u>, 475 U.S. at 481 ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible [when] that action is [] taken only once.").

### B.   Mrs. Teblum's Municipal Liability Allegations

The Complaint also satisfies the applicable pleading standard for Mrs. Teblum in at least one of two ways.   The "authority to make municipal policy may be . . . delegated by an official who possesses such authority."   <u>Mandel</u>, 888 F.2d at 792.   The Authority's Board delegated to Mr. Stephenson the "power to . . . terminate personnel, provided, however, that the Superintendent [would] exercise this power in accordance with the personnel rules and policies adopted by the Authority."   Cape Coral, Fla., Code § 26-15(b)(37) (2016).   Mr. Stephenson was also "responsible . . . for directing the work of the personnel of the Cape Coral Charter Schools."   <u>Id.</u> § 26-15(b)(15) (2016).

While final policymaking authority over a subject area does not vest in an official whose decisions in that area are subject to meaningful administrative review, <u>Quinn v. Monroe Cnty.</u>, 330 F.3d 1320, 1325 (11th Cir. 2003), the Authority provides no indication that Mr. Stephenson's decisions were, in fact, subject to such review.   Alternatively, under a ratification theory, Mrs. Teblum may show that the Authority, "by actively endorsing or approving the conduct of its employees or officials, may be held responsible for it."   <u>Garvie v. City of Fort Walton Beach</u>, 366 F.3d 1186, 1889 (11th Cir. 2004) (citation and quotation omitted).   To succeed in this approach, Mrs. Teblum "must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis."   <u>Id.</u>

To that end, Mrs. Teblum emailed Mr. Stephenson her Whistleblower Retaliation Complaints form.   (Doc. 3 at 5; Doc. 3-5, Ex. E.)   There, Mrs. Teblum explained that she was transferred to a different school because she reported "violations of ESE law."   (Id.)   Initially, when she followed up with Mr. Stephenson, he assured her that she had not been fired, but rather "saved from further backlash . . . [h]ence the reason <u>he</u> had chosen to transfer" her.   (Id. (emphasis added)).   But Mrs. Teblum learned that Mrs. Collins "made the decision to transfer" her, and that Mrs. Collins also "placed [Mrs. Teblum] in such a position as to be demoted and/or fired."   (Id.)   Construing these allegations in Mrs. Teblum's favor, either: (a) Mr. Stephenson—as the superintendent with the power to direct and terminate Authority personnel—transferred Mrs. Teblum for reporting ESE violations; or (b) Mr. Stephenson reviewed and approved Mrs. Collins's decision over the same thereby ratifying her actions.

Even if the Board did not delegate policymaking authority to Mr. Stephenson, the Complaint also alleges facts from which the Court can infer that the Board itself knew of these adverse actions against Mrs. Teblum.   Mr. Stephenson apparently forwarded Mrs. Teblum's form to the City of Cape Coral City Attorney.   (Doc. 3-6, Ex. F.)   Then, the City Attorney told Mrs. Teblum that "[i]n accordance with Charter School policy . . . the Authority <u>will</u> be commencing an investigation of the allegations in your complaint.   After the investigation is complete, the Authority <u>will</u> make a determination regarding your complaint."   (Id. (emphasis added)).   If the Authority did not delegate the power to relocate or terminate Mrs. Teblum, then

these affirmative representations can give rise to the inference that the Board learned of, and later ratified, Mrs. Teblum's adverse employment consequences for reporting ESE law violations.   Cf. K.M., 150 F. App'x at 958 (letter from school district's attorney insufficient to establish municipal liability where letter neither identified decisionmaker nor explained what decision a school board may have taken).   Accordingly, the Complaint contains facts which show that the Authority may be liable to Mrs. Teblum under section 1983.

## CONCLUSION

Based upon the foregoing, the Authority has not met its burden for dismissal of the Teblums' Complaint.   This is not to say that its arguments are incorrect or otherwise without merit.   To the contrary, the Authority identifies many issues over which it may ultimately prevail.   But instead of focusing on the relevant pleading standard, the Authority has raised fact-intensive arguments better suited for a summary judgment motion.   The Teblums have alleged facts which, when construed in their favor, could support a finding that the Teblums engaged in protected speech for which the Authority retaliated against them.   Accordingly, it is **ORDERED** that the Authority's Motion to Dismiss (Doc. 11) is **DENIED**.

**ORDERED** at Fort Myers, Florida, on March 29, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE