UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DARYL TEBLUM and AMY TEBLUM,

      Plaintiffs,

v.                                  Case No:   2:20-cv-547-JLB-MRM

THE CITY OF CAPE CORAL CHARTER
SCHOOL AUTHORITY, a Public Body
Corporation, a/k/a CITY OF CAPE CORAL,
FLORIDA,

      Defendant.

_____

## **ORDER**

This First Amendment retaliation case is about whether Plaintiffs Amy and Daryl Teblum, husband and wife, criticized the City of Cape Coral Charter School Authority ("Authority") as private citizens or in their capacities as Authority employees and if the Authority retaliated against Mrs. Teblum because of Mr. Teblum's actions.   Mr. Teblum served on the Authority's governing board and Mrs. Teblum taught at its elementary schools.   Over the span of three years, the two made comments critiquing the Authority's practices and its employees' implementation of the same.   They posit that, because of those comments, the Authority forced Mr. Teblum to resign from the board and transferred Mrs. Teblum to a different campus, ultimately terminating her employment.

The Teblums now argue that, in doing so, the Authority violated their First Amendment rights under the U.S. Constitution to free speech and freedom of association.   The Authority moves for summary judgment, principally arguing that

the Teblums spoke as public employees, not as private citizens, and their speech was therefore unprotected by the First Amendment.   Alternatively, the Authority claims its actions were justified given the important need of administering education in an effective and orderly manner.

The Court agrees with the Authority.   Because the Teblums spoke as public employees, the Authority did not violate their freedom of speech by taking the above action; nor can a reasonable jury determine that the Authority violated Mrs. Teblum's right to associate with her husband when it transferred her and failed to renew her teaching agreement.   Accordingly, the Authority's motion for summary judgment (Doc. 34) is **GRANTED**.

**BACKGROUND**[1]

## I.   Introduction

The Authority operates four charter schools for the City of Cape Coral, Florida.   (Doc. 34 at ¶ 1); see also Cape Coral, Fla., Code § 26-2 (2022) (effective 2004).   Mrs. Teblum began working for the Authority as a teaching assistant in 2010.   (Doc. 34 at ¶ 6; Doc. 33-5 at ¶ 5.)   Mr. Teblum was appointed to the Authority's board to serve a three-year term on April 1, 2013.   (Doc. 34 at ¶ 5; Doc. 33-7 at 3.)   In March 2014, Mrs. Teblum became an Exceptional Student Education

---

[1] The Teblums challenge only certain portions of the Authority's Statement of Material Facts.   (Doc. 42 at 2 n.3.)   Otherwise, they state that the "paragraphs not specifically contested may be considered admitted for the purposes of the Motion [for summary judgment] only."   (Id.)   Accordingly, the Court will note only those facts not in dispute while otherwise construing the record in the Teblums' favor as the nonmoving party

("ESE") teacher at the Authority's Christa McAuliffe Elementary school ("McAuliffe Elementary").   (Doc. 33-6 at 4; Doc. 39-3 at 15.)   Jackie Collins ("Principal Collins") was the principal of McAuliffe Elementary and Mrs. Teblum's direct supervisor.   (Id. at 17.)   Nelson Stephenson ("Superintendent Stephenson") was the Authority's superintendent.   (Doc. 33-5 at ¶ 2.)

## II.    Mr. Teblum's Claim

Mr. Teblum's responsibilities as a board member included ensuring that "the laws were being carried out, as well as [the Authority's] own rules."   (Doc. 39-2 at 7.)   It "was the responsibility of the governing board to do [their] best to ensure accuracy and transparency."   (Id. at 9.)   At his first board meeting, for example, Mr. Teblum questioned the Authority about mismanaging its budget.   (Id. at 7.) He then reported these budgetary concerns to Superintendent Stephenson.   (Id. at 8.)   Mr. Teblum also perceived unethical behavior by Principal Collins while voting on matters that she presented to the board for approval.   (Id. at 12–13.)   He believed that Principal Collins would "withhold[] facts" or afterward act in a manner inconsistent with what the board approved.   (Id. at 13.)   To illustrate, Principal Collins sought board approval for a fieldtrip.   (Id.)   Based on the information she provided, the board approved a trip for an entire fifth-grade class. (Id.)   But Principal Collins later limited the trip only to certain students.   (Id.) Mr. Teblum also raised these issues with both Principal Collins and Superintendent Stephenson.   (Id.)

- 3 -

In an email to Superintendent Stephenson, dated January 11, 2016, Mr. Teblum summarized these and other "administrative violations" that he had observed Principal Collins undertake.   (Doc. 3-2.)   Mr. Teblum reiterated that the "school board was being given questionable or inaccurate information" by Principal Collins.   (Id. at 1.)   Mr. Teblum also explained that when he tried to discuss these issues with Principal Collins, he faced "threats and intimidation tactics made in emails by [Principal] Collins and a lack of transparency."   (Id.)   "The result of a governing board member inquiring about information," Mr. Teblum said, "was met with . . . continued harassment and discrimination by [Principal] Collins."   (Id.)

Mr. Teblum concluded by "requesting this item be placed on the January 201[6] governing board agenda to suspend principal Collins pending a full investigation . . . based on Administrator misconduct, threats, . . . intimidation tactics, the lack of transparency at [McAuliffe Elementary] and discrimination." (Id. at 2.)   At the January 2016 board meeting, Mr. Teblum voiced his concerns about Principal Collins at the but "was [verbally] attacked" by those in attendance. (Doc. 39-2 at 26.)   Afterward, several Authority teachers circulated and signed a petition condemning his criticisms about Principal Collins and the Authority.   (Id. at 30; Doc. 3-3.)   At the next board meeting in March 2016, "a bunch of teachers stood up reading complaints against" Mr. Teblum.   (Doc. 39-2 at 26.)   It was around this time that Superintendent Stephenson informed Mr. Teblum that "if he wished to serve another three-year term on the Authority's governing board, he

could so long as" his wife, Mrs. Teblum, resigned her teaching position at the Authority.   (Doc. 33-5 at ¶ 22.)

Shortly after Mr. Teblum was appointed to the Authority's board, the Florida legislature enacted section 1002.33, Florida Statutes.   That statute went into effect July 1, 2013, and the relevant subdivision states: "An employee of the charter school, or his or her spouse, or an employee of a charter management organization, or his or her spouse, may not be a member of the governing board of the charter school."   Fla. Stat. § 1002.33(26)(c) (2013).   Given that Mrs. Teblum was teaching at the Authority, the Authority sought an advisory opinion from the Attorney General of Florida.   (See Doc. 33-7.)   The Florida Attorney General reasoned that the statute was prospective so, while he would be ineligible for reappointment if Mrs. Teblum still worked for the Authority, Mr. Teblum could finish his initial term.   (Id. at 3.)   After Superintendent Stephenson presented this explanation to Mr. Teblum, coupled with the fact that Mr. Teblum's "family was going to lose income to [their] home" since his position was unpaid, Mr. Teblum resigned "under duress" believing he "had no choice."   (Doc. 39-2 at 21.)   His last day on the Authority's board was March 8, 2016.   (Doc. 33-5 at ¶ 5.)

## III.   Mrs. Teblum's Claims

As an ESE teacher, Mrs. Teblum "was assigned students . . . with Individual Education Plans [("IEPs")]" and "ensure[d] that those plans were followed by all individuals working with the student."   (Doc. 39-3 at 17.)   She "worked alongside teachers in classrooms" and also "held meetings as a case manager for each of the

students assigned to [her] with IEPs." (Id. at 18.)  Around October 2015, she

informed Superintendent Stephenson that she was having issues with Principal

Collins not attending mandatory IEP meetings.  (See id. at 65–66.)  Principal

Collins, rather than going to those meetings, would ask Mrs. Teblum simply to "sign

documents [stating she or a vice principal] were in attendance." (Id.)  Mrs.

Teblum told Superintendent Stephenson that she "didn't feel comfortable doing that

every time [she] had" a meeting.  (Id. at 66.)  She also stated that "[i]t was illegal

and it was [her] job, as case manager, to ensure that everything was done correctly

and legally." (Id.)

　　　In another instance, Mrs. Teblum discovered that Tanya Sykes—also a

teacher at the Authority—was not providing certain accommodations to an ESE

student.  (Id. at 77–80.)  Ms. Sykes was "choosing to not follow a legal document

that [was Mrs. Teblum's] responsibility to ensure is occurring." (Id. at 79–80.)

When Mrs. Teblum told Ms. Sykes that she could not "do that, that's illegal," the

"conversation ended" and Ms. Sykes "no longer engaged in verbal conversation

with" Mrs. Teblum.  (Id. at 77.)  So, on February 24, 2016, Mrs. Teblum asked

Principal Collins to "help [Mrs. Teblum] communicate with Ms. Sykes." (Id.)

　　　But Mrs. Teblum did not speak with Principal Collins again until March 11,

2016, when Principal Collins informed her that she was being transferred to the

Oasis Elementary School ("Oasis Elementary") campus because Mrs. Teblum was a

"conflict of interest." (Id. at 83–84.)  On March 13, 2016, the day before she

started at Oasis Elementary, Mrs. Teblum emailed Superintendent Stephenson

expressing her concerns that she was suffering retaliation for Mr. Teblum's critical comments and her own reports about ESE violations.   (Doc. 39-1 at 151.)   Mrs. Teblum requested Superintendent Stephenson accompany her in "safely obtain[ing] the rest of [her] personal belongings" from McAuliffe Elementary "without fear of further retaliation."   (Id.)

On March 30, 2016, Mrs. Teblum sent Superintendent Stephenson a Whistleblower Retaliation Complaint against Principal Collins.   (Id. at 140–43.) Mrs. Teblum stated she "believe[d] [she had] been retaliated against in [her] employment by . . . Principal Jacquelin Collins" for "reporting improper procedures, violations of ESE law, and [Principal Collins's] willful neglect to comply with her own job performance standards."   (Id. at 141.)   Principal Collins, also around this time, informed Superintendent Stephenson that Mrs. Teblum's teaching credentials were "out of compliance."   (Doc. 39-1 at 86.)   Based on "maybe there [being] a certification that wasn't completed," Principal Collins sought approval in converting Mrs. Teblum to a substitute teacher "which [meant] loss of benefits, loss of pay, and not a guarantee of a job at all."   (Id. at 94, 144.)   Superintendent Stephenson forwarded Principal Collins's request to the Authority's counsel who, "to avoid any hint of retaliation" given Mrs. Teblum's Whistleblower Complaint, advised "hold[ing] off at this time."   (Id. at 144.)

Ultimately, Mrs. Teblum's teaching agreement was terminated on June 30, 2016.   (Doc. 33-5 at ¶ 16; Doc. 39-1 at 122; Doc. 42 at ¶ 40.)   On July 12, 2016, the

Authority failed to renew Mrs. Teblum's employment for the following 2016-2017 academic year.   (Doc. 39-1 at 147.)

## IV.   The Teblums' Pleading

The Teblums' assert three claims.   (Doc. 1-1.)   In Counts I and III of the Second Amended Complaint, they allege that the Authority retaliated against them for their protected speech.   (Id. at 5, 9.)   Specifically, Mr. Teblum claims the Authority allowed him to be ridiculed, forced him to resign, and then terminated his wife in retaliation for the comments he made to Superintendent Stephenson and at board meetings.   (Id. at 5–7.)   And Mrs. Teblum claims she was transferred and eventually terminated for reporting violations of IEP law as outlined above.   (Id. at 9–12.)   In Count II, Mrs. Teblum also alleges that the Authority violated her right to freedom of association when she was transferred and terminated as a result of her marriage to Mr. Teblum after he voiced criticisms of the Authority.   (Id. at 8–9.)   The Authority has moved for summary judgment (Doc. 34), and the Teblums have responded (Doc. 42).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A fact is 'material' if it has the potential of 'affect[ing] the outcome' of the case."   Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted).   "And to raise a 'genuine' dispute, the nonmoving party must point to enough evidence that 'a reasonable jury could return

a verdict for [him].'" Id. (citation omitted).   If this showing is made, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial."  Id. (quotation omitted).   "When considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Id. (citation omitted).   Last, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) (internal quotation marks and citation omitted).

## DISCUSSION

The Authority's motion is due to be granted.   The Teblums' speech arose from their duties as a board member and ESE teacher, respectively.   Their criticisms and comments did not merely concern or arise from their positions but actively furthered their duties as Authority personnel.   The Teblums therefore spoke as public employees and their speech was unprotected.   Further, as to Mrs. Teblum's association claim, the Authority has shown that its interest in the efficient administration of its schools justified her transfer from McAuliffe Elementary to a different campus.   The Authority has also shown that it would have terminated Mrs. Teblum regardless of her marriage to Mr. Teblum.   As a result, the Authority is entitled to summary judgment on all claims.

I.     **The Teblums did not engage in protected speech**.

A.     **The "citizen" and "public concern" requirements**.

Public employees must necessarily accept certain limitations on their constitutional rights, but this does not mean that the government may retaliate against them simply for engaging in behavior protected under the First Amendment.   Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).[2]   Whether a public employee's speech is protected under the Constitution depends on if the employee spoke "as a citizen on a matter of public concern."   Garcetti, 547 U.S. at 418.   "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."   Id.   The "central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities," in which case it is unprotected.   Moss v. City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir. 2015) (quoting Garcetti, 547 U.S. at 421).

Speech owing its existence to an employee's professional responsibilities is a narrow category "encompass[ing] speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely

---

[2] In the Second Amended Complaint, Mr. Teblum alleges that he "was not an employee of the Board."   (Doc. 1-1 at ¶ 44.)   He does not reassert this position in response to the Authority's motion for summary judgment and otherwise raises no argument in support of a contrary finding.   (See Doc. 42.)   The Court therefore assumes without deciding that an unpaid volunteer like Mr. Teblum is a government employee for First Amendment retaliation purposes.   See Teblum v. City of Cape Coral, No. 2:20-cv-547-JLB-MRM, 2021 WL 1172910, at *3 (M.D. Fla. Mar. 29, 2021).

speech that <u>concerns</u> the ordinary responsibilities of her employment." <u>Alves v. Bd.</u> <u>of Regents</u>, 804 F.3d 1149, 1162 (11th Cir. 2015) (emphasis added) (discussing <u>Lane</u> <u>v. Franks</u>, 573 U.S. 228, 239–41 (2014)). Inasmuch, the "proper inquiry" in defining the scope of an employee's duties "is a practical one." <u>Garcetti</u>, 547 U.S. at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform" thus "written job description[s] [are] neither necessary nor sufficient to demonstrate . . . the scope of the employee's professional duties for First Amendment purposes." <u>Id.</u> at 424–25. It comes as no surprise then, that "[a]ctivities undertaken in the course of performing one's job are activities undertaken 'pursuant to employment responsibilities.'" <u>Alves</u>, 804 F.3d at 1164 (citing <u>Garcetti</u>, 547 U.S. at 422–24). Ultimately, this is a "question[] of law for the [C]ourt to resolve." <u>Id.</u> at 1159.

Last, "[t]o fall within the realm of 'public concern,' an employee's speech must relate to 'any matter of political, social, or other concern to the community.'" <u>Alves</u>, 804 F.3d at 1162 (quotation omitted). Courts look to "the content, form, and context of a given statement, as revealed by the whole record." <u>Connick v. Myers</u>, 461 U.S. 138, 147–48 (1983). Relevant considerations are "whether the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." <u>Vila v. Padron</u>, 484 F.3d 1334, 1340 (11th Cir. 2007). For example, "courts have found speech that concerns internal administration of the educational system and personal grievances will not

receive constitutional protection." <u>Alves</u>, 804 F.3d at 1166 (quoting <u>Maples v. Martin</u>, 858 F.2d 1546, 1552 (11th Cir. 1988)).   "However, [an employee] whose speech directly affects the public's perception of the quality of education in a given academic system find[s her] speech protected." <u>Id.</u> (quoting <u>Maples</u>, 858 F.2d at 1553).

With these principles in mind, the Court will now analyze the Teblums' speech at issue.

### B.   Mr. Teblum spoke as a board member and raised personal grievances.

Relying on Mr. Teblum's deposition testimony, the Authority argues that Mr. Teblum's statements criticizing Principal Collins and the Authority "go directly to the heart of Daryl Teblum's responsibilities as a governing board member."   (Doc. 34 at 15.)   Mr. Teblum responds by identifying his January 11, 2016 and March 18, 2016 emails to Superintendent Stephenson.   (Doc. 42 at 10.)   He argues that the "testimony does not address whether Mr. Teblum believed all of the issues he raised in his email to Stephenson on January 11, 2016 were part of his duties as a Board member."   (<u>Id.</u>)   Mr. Teblum also notes that he sent the communication from his private email address.   (<u>Id.</u>)   And Mr. Teblum argues he "was no longer a Board member" when he sent the March 18 email and was therefore "acting in the capacity of a non-Board member . . . rais[ing] concerns as a private citizen."   (<u>Id.</u> at 11.)[3]

---

[3]   The Teblums also rely on the Court's denial of the Authority's motion to dismiss.   (Doc. 42 at 9–10.)   They note that the "Court previously indicated that reasonable inferences from the allegations in the Second Amended Complaint

Mr. Teblum sent the January 11 email in furtherance of his self-described duties and thus was speaking as a board member.   Mr. Teblum ensured the board approved matters in an accurate and transparent manner and that the Authority's rules were being carried out.   (Doc. 39-2 at 7, 9.)   And those responsibilities are at the heart of Mr. Teblum's email.   True, he mentions safety concerns, like Principal Collins abandoning McAuliffe Elementary without adequate supervision; but those concerns were a pretext for getting Superintendent Stephenson and the board to act against Principal Collins.   (See Doc. 3-2.)   Besides those ancillary issues, Mr. Teblum highlighted the "questionable or inaccurate information" Principal Collins provided the board.   He expressed concern over the "lack of transparency" between Principal Collins and himself whenever he would try and resolve these issues.   (Id. at 1.)   In fact, Mr. Teblum characterizes these interactions, resulting in "threats and intimidation tactics," as the efforts "of a governing board member inquiring about information."   (Id.)   Even when discussing the purported "discrimination and retaliation" that students who did not attend the field trip experienced, Mr. Teblum noted that "this is the same type of behavior [Principal] Collins displays to this governing board member and her staff."   (Id.)

---

supported [the Teblums' claims]."   (Id. at 9.)   But their reliance on that order is misplaced because the Court expressly opined that it was "focusing on the relevant pleading standard" and "the Authority's . . . fact-intensive arguments [would be] better suited for a summary judgment motion" like the one sub judice.   Teblum, 2021 WL 1172910, at *8 (emphasis in original).   In other words, the Court did not have the "benefit of a developed summary-judgment record with specific job duties to assist [its] analysis."   Id. at 5.

Importantly, Mr. Teblum's grievances did not arise merely from the knowledge he gained as a public employee—they were made in active furtherance of his self-attested duties.   The email culminated in a request that "this item be placed on the January 201[6] governing board agenda to suspend principal Collins pending a full investigation . . . based on Administrator misconduct, threats, . . . intimidation tactics, the lack of transparency at [McAuliffe Elementary] and discrimination."   (<u>Id.</u> at 2.)   And when Superintendent Stephenson failed to act, Mr. Teblum testified that "as a board member, [he] believe[d] [he] need[ed] to bring this forward, and [he was] going to bring this forward at the meeting, which [he] did."   (Doc. 39-2 at 26.)

The Court finds that the statements in the January 11 email, even viewing them in the light most favorable to Mr. Teblum, squarely fall "in the course of performing—or, more accurately, in the course of <u>trying</u> to perform—[his] ordinary role" as a board member.   <u>Alves</u>, 804 F.3d at 1164 (emphasis in original).   Mr. Teblum's complaints "owe[d] [their] existence" to his professional responsibilities as a public employee of the Authority.   <u>Abdur-Rahman v. Walker</u>, 567 F.3d 1278, 1283 (11th Cir. 2009).

The Court also finds that Mr. Teblum did not send the March 18 email intending to address a matter of public concern.   He informed Superintendent Stephenson that he was "in the process of filing for an investigation" into Principal Collins and the Authority.   (Doc. 39-1 at 139.)   Mr. Teblum then mentions another instance of retaliation that he and Mrs. Teblum experienced.   (<u>Id.</u>)   "Considering

- 14 -

how often we have been [intimidated] and retaliated against," Mr. Teblum prefaced, "my wife has asked for you to be present for her to obtain her belongings . . . ." (Id.) These remarks concern the Teblums and their personal interaction with the Authority and thus, the "personal grievances" of Mr. Teblum's March 18 email are not entitled to constitutional protection.   Alves, 804 F.3d at 1166.

For these reasons, summary judgment in the Authority's favor on Mr. Teblum's claim is appropriate.

**C.    Mrs. Teblum's reports arose from her duties as an ESE teacher**.

Mrs. Teblum likewise fails to rebut the Authority's showing that her speech was made as a public employee.   At issue are her reports about Principal Collins "failing to attend IEP meetings" and "co-worker Sykes' failure to administer ESE plans."   (Doc. 42 at 11.)   Ignoring the former, she only addresses the latter by arguing that the Authority "has not provided the Court with record evidence to establish that Mrs. Teblum's job duties actually included . . . report[ing] to [Principal] Collins [Ms. Sykes's] failure to administer the ESE protocols properly." (Id. at 12.)[4]   Yet this argument eschews Garcetti's holding that "formal job

_____

[4] Mrs. Teblum testified that "it was [her] job, as case manager, to ensure that everything was done correctly and legally."   (Doc. 39-3 at 66.)   Mrs. Teblum told Superintendent Stephenson she "wasn't feeling comfortable with completing [her] duties under [Principal Collins's] direction at the time, . . . unless [she was] going to actually participate in those meetings, because [Mrs. Teblum] didn't know what to do."   (Id. at 72.)   She also confirmed "these concerns were . . . related to [her] job functions within [McAuliffe Elementary] in the IEP and ESE program."   (Id. at 72–73.)   "It was work related."   (Id. at 65.)   Thus, Mrs. Teblum was not speaking as a citizen but as an ESE teacher trying to perform her duties in ensuring that the ESE "meetings were[] being held when they were supposed to be held."   (Id. at 73.)

descriptions 'often bear little resemblance to the duties an employee actually is expected to perform.'"   <u>Alves</u>, 804 F.3d at 1164 (quoting <u>Garcetti</u>, 547 U.S. at 424– 25).   "Instead, <u>Garcetti</u> and its progeny require a 'functional review' of an employee's speech in relation to her duties or responsibilities."   <u>Id.</u>

Mrs. Teblum testified that, as an ESE teacher, she was responsible for "ensur[ing] [IEPs] were followed by all individuals working with the [ESE] student," like Ms. Sykes.   (Doc. 39-3 at 17.)   When Mrs. Teblum discovered that Ms. Sykes "was not providing the listed accommodations in the IEPs, of which [they] had written together," Mrs. Teblum "went and spoke with [Principal] Collins."   (<u>Id.</u> at 76.)   Specifically, she approached Principal Collins because she was facing "a challenging situation with a colleague . . . . [to whom she] provided services . . . on a regular scheduled basis [and] supported them within their classrooms."   (<u>Id.</u> at 75– 76.)   Mrs. Teblum was asking Principal Collins "for help.   [She] said, 'Please help me communicate with Ms. Sykes.'"   (<u>Id.</u> at 79.)

And contrary to what the Court may have inferred at the pleading stage, Mrs. Teblum did not report Ms. Sykes's failure to administer the ESE program because of any public concern over that failure "directly affect[ing] the public's perception of the quality of education in a given academic system."   <u>Maples</u>, 858 F.2d at 1553; (Doc. 42 at 11–12.)   Instead, she was seeking assistance in performing her job.   The two had a positive working relationship in the past but Mrs. Teblum felt "like [she] hit a wall" with Ms. Sykes.   (<u>Id.</u> at 80.)   So she asked Principal Collins for help in fulfilling her duties as an ESE teacher.   The "form,

content, and context" of Mrs. Teblum's complaint shows her motivation in reporting Ms. Sykes was because of an interference with her own responsibilities as an ESE teacher and the breakdown in communication between the two frustrating the performance of those responsibilities.   Alves, 804 F.3d at 1166.

In sum, because Mrs. Teblum made these reports in the course of performing her duties as an ESE teacher, her speech not protected under the First Amendment and the Authority is also entitled to summary judgment on this claim.   See Battle v. Bd. of Regents, 468 F.3d 755, 761–62 (11th Cir. 2006) (holding that plaintiff's retaliation claim failed because her "speech to [school] officials about inaccuracies and signs of fraud in student files was made pursuant to her official employment responsibilities").

## II.   The Authority was justified in transferring and terminating Mrs. Teblum.

Mrs. Teblum also claims that she "experienced two adverse employment actions which were based, at least in part, on her status as Mr. Teblum's wife: (1) her transfer from" McAuliffe Elementary to Oasis Elementary; and "(2) her non-renewal for the 2016-2017 school year."   (Doc. 42 at 15.)

The freedom of association guaranteed by the First Amendment encompasses the right to intimate associations, including marriage.   McCabe v. Sharrett, 12 F.3d 1558, 1562–63 (11th Cir. 1994); Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984).   A government employer thus cannot retaliate against a public employee solely for engaging in associative activity like her marriage to another.   Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir. 1987).

The Court must first determine whether the plaintiff has shown the activity at issue is protected.   Here, there can be no doubt Mrs. Teblum was engaged in a protected activity because, as discussed above, the right to association includes the right to marriage.   See id.[5]   Next, the Court balances "the employee's interest in the exercise of a constitutional right against the employer's interest in maintaining an efficient workplace" under Pickering.   Starling v. Bd. of Cnty. Comm'rs, 602 F.3d 1257, 1260–61 (11th Cir. 2010); see also Shahar v. Bowers, 114 F.3d 1097, 1103 (11th Cir. 1997) (en banc) (applying Pickering in intimate-association context).

"If the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a 'substantial part' [or 'motivating factor'] in the government's decision to demote or discharge the employee."   Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989) (quoting Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)).   "If the plaintiff carries this burden, the burden shifts to the board to show by a preponderance of the evidence that the same employment decision would have been rendered even in the absence of the protected conduct."   Hatcher, 809 F.2d at 1556; Mt. Healthy, 429 U.S. at 287.   "If the Pickering balance weighs in favor of the government, the employee cannot prevail on [her] First Amendment claim, and there is no point in submitting it to a jury."   Jackson v. State of Alabama, 405 F.3d 1276, 1280 (11th Cir. 2005).

---

[5] "[U]nlike speech . . ., associational activity by public employees need not be on matters of public concern to be protected under the First Amendment." D'Angelo v. Sch. Bd., 497 F.3d 1203, 1212 (11th Cir. 2007).

### A.    Mrs. Teblum's transfer to Oasis Elementary did not violate her constitutional rights.

The Authority correctly notes that it "has a serious need for the orderly administration of school business."   (Doc. 34 at 24.)   Mrs. Teblum contends that, "[a]s the Authority has not set forth any clear reason outside of . . . Mrs. Teblum's protected conduct for the transfer, the Court need not engage in the <u>Pickering</u> balancing test as to how such a reason fares in comparison to [Mrs. Teblum's] constitution right[] to . . . intimate association."   (Doc. 42 at 22 n.12.)   She does not offer anything more by way of analysis on the <u>Pickering</u> factors except to state that the "decision to transfer Mrs. Teblum was more about <u>her</u> comfort, not the Authority's need for efficient operations."   (<u>Id.</u> (emphasis in original)).   But the Authority clearly notes that the Teblums' criticism of Principal Collins "impede[d] the Authority's ability to administer its services."   (Doc. 34 at 24.)

In determining whether Mrs. Teblum's marriage to Mr. Teblum impeded the Authority's ability to perform its duties efficiently, the Court examines "whether the statement impairs discipline by superiors or harmony among co-workers, [or] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary."   <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987). Pertinent considerations include whether Mrs. Teblum's association "impeded [her] proper performance of [her] daily duties in the classroom or . . . interfered with the regular operation of the [Authority] generally."   <u>Pickering</u>, 391 U.S. at 572–73 (1968).

The record contains ample evidence of how Mr. and Mrs. Teblum's association undermined the Authority's functioning—particularly at McAuliffe Elementary.   Mrs. Teblum testified that the teachers there "were all pissed off at [her] husband."   (Doc. 39-3 at 120.)   Superintendent Stephenson corroborated that "the mood at [Christa was] bad, it [was] dark and," because of Mr. Teblum's actions at board meetings, the teachers were "worried about what [Mrs. Teblum was] going to tell her husband" (Doc. 39-1 at 40).   Thus, "nobody wanted to work with" Mrs. Teblum at McAuliffe Elementary.   (Doc. 39-3 at 141.)

Moreover, and despite previously working with Ms. Sykes in administering the ESE program at McAuliffe Elementary, Ms. Sykes "simply refused" to speak with Mrs. Teblum after Mr. Teblum's comments about Principal Collins; as did "a lot of the teachers."   (Id. at 117–18.)   Some thirty teachers signed a petition condemning Mr. Teblum and his actions, collecting signatures while students "were in their classrooms and the teachers were supposed to be teaching."   (See Doc. 3-3; Doc. 39-2 at 30.)   Mrs. Teblum believed no one wanted to work with her because she was married to Mr. Teblum.   (Id. at 141.)   After his criticisms, she "was a conflict of interest, prior to [his comments] there was no reason for [Mrs. Teblum] to be transferred or for no one to not want to work with [her]."   (Id. at 142.)

In sum, Mr. Teblum's "bitter complaints to all who would listen [at the Authority] severely undermined the morale of the" faculty at McAuliffe Elementary. Bryson, 888 F.2d at 1567.   While it is true that Superintendent Stephenson considered Mrs. Teblum's comfort in deciding that a transfer from McAuliffe

Elementary to Oasis Elementary was warranted, he also did it "for everybody's protection, for everybody's piece of mind."   (Doc. 39-1 at 46.)   In fact, he testified that "none of this stuff raised its head anymore" after the transfer.   (Id.)

The Court thus finds that Mrs. Teblum's marriage to Mr. Teblum undermined the Authority's ability to operate McAuliffe Elementary.   Mrs. Teblum could not perform her duties as an ESE teacher and, because of a loss in morale, the faculty also would not work with her out of concern she would share their interactions with her husband.   These factors, alone, tip the <u>Pickering</u> balance in the Authority's favor.   And given that Mrs. Teblum has done little to refute these facts, the Court finds her transfer was justified.   That said, because the interpersonal conflicts at Christa Elementary were mitigated by Mrs. Teblum's transfer, the Authority's interest in the efficient administration of its schools cannot justify its eventual decision to not renew her employment.

**B.    The Authority would have terminated Mrs. Teblum regardless of her association with Mr. Teblum.**

Mrs. Teblum also claims that the Authority ultimately failed to renew her teaching agreement because of her marriage.   Even accepting that Mr. Teblum's actions were a substantial or motivating factor for Mrs. Teblum's nonrenewal, the Authority is still entitled to summary judgment.   The Authority has shown that it would have "reached the same decision as to [Mrs. Teblum's] reemployment even in the absence of" any association between husband and wife.   <u>Mt. Healthy</u>, 429 U.S. at 576.   Mrs. Teblum does not identify record evidence that refutes this conclusion and there is accordingly no <u>genuine</u> dispute on this point for a jury to resolve.

The Authority maintains that its "decision to not renew her teaching contract was solely the result of Amy Teblum failing to obtain the necessary teaching credentials needed for her permanent teaching certificate."   (Doc. 34 at 22.)   Mrs. Teblum's position as an ESE teacher was governed by a Teacher Employment Agreement.   (Doc. 39-1 at 122.)   That agreement was expressly "contingent on [Mrs. Teblum] being legally qualified to teach in the State of Florida and possessing a valid Florida Teacher's Certificate" or other state-approved teaching credential "for the grade, class, or subject matter to be taught by" her.   (Id. at 124.)   "Failure to hold a valid Teaching Certificate . . . would disqualify [Mrs. Teblum] for the position [and would] immediately cause [the agreement] to be terminated."   (Id.) The record also includes an Official Statement of Status of Eligibility from the Florida Department of Education.   (Id. at 145.)   The statement was issued February 11, 2014 and expired on December 9, 2016.   (Id.)   Mrs. Teblum was eligible for, and received, a temporary teaching certificate valid for three years when she began working as an ESE teacher at Christa.   (Doc. 39-1 at 145; Doc. 39-3 at 28–30.)

As noted on Mrs. Teblum's Official Statement of Status of Eligibility (Doc. 39-1 at 145–46), she was required to obtain a passing score on the Florida General Knowledge Test within one year of employment.   Fla. Stat. § 1012.56(7)(c) (2014). At the time the Authority decided to not renew her teaching agreement, the statute expressly stated that a "school district shall not employ, or continue the employment of, an individual in a position for which a temporary certificate is

required beyond this time period if the individual has not met the requirement of paragraph 2(g)" (i.e., demonstrate "mastery of general knowledge").   Id. § 1012.56(2)(g), 1012.56(7)(c) (2016).   The validity of a temporary certificate could be extended for two years if, due to illness or injury, an employee failed to satisfy certain requirements "for the professional certificate, not including the requirement in paragraph (2)(g)."   Id. § 1012.56(7)(c) (2016) (emphasis added).

Mrs. Teblum argues that the "Authority has not set forth evidence to establish that Mrs. Teblum's position of 'teacher,' as the term was used by the Authority, fell into the statute's definition of a position she could not have held while (allegedly) out of compliance."   (Doc. 42 at 23.)   There are at least two main problems with this argument.   First, it entirely ignores Mrs. Teblum's teaching agreement and the Official Statement issued by the Florida Department of Education—both of which are part of the record evidence before the Court.   Second, the statutes in effect at the time of obtaining her teaching agreement and at the time of her termination apply to "[e]ach person seeking certification," of which Mrs. Teblum undoubtably was.   Fla. Stat. § 1012.56(1) (2014) (2016).[6]   And, despite correctly noting that Mrs. Teblum was required to be eligible for a teaching

---

[6] Mrs. Teblum's other arguments on this point are similarly unavailing.   She suggests that a jury could infer that "she was not prohibited from maintaining her position as a 'teacher' as the Authority defined it" from the fact that the Authority retained Mrs. Teblum as an ESE teacher for over a year despite her not passing the exam.   (Doc. 42 at 23.)   But she cites no evidence in support of this hypothetical. Suffice it to say, "[s]peculation or conjecture cannot create a genuine issue of material fact."   Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (citing Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)).

certificate (Doc. 42 at 23), she does not otherwise identify any record evidence showing that she obtained a passing score on the general knowledge exam within one year as Florida law required.

Finally, Mrs. Teblum argues that "there is no reason that the Authority could not have renewed Mrs. Teblum into" a different position that did not require a certificate like a substitute teacher or her assistant position.   (Id. at 24.)   The crux of this argument is that the Authority, while perhaps justified in not renewing her as an ESE teacher, could not terminate her employment in any role.   But Mrs. Teblum does not cite, nor has the Court found, any authority requiring a public employer to ameliorate its otherwise justified decision terminating a public employee by providing that employee with an alternative position for which she did not apply.   Mrs. Teblum has alleged, and framed her entire argument around the notion, that the adverse employment action here was the Authority's decision "to non-renew, and/or to fail to sponsor Mrs. Teblum's temporary teaching certificate." (Doc. 1-1 at ¶ 62.)   Mrs. Teblum has also not cited to any record evidence that she applied for a different position but that the Authority denied her application due to her association with Mr. Teblum.   Without further support, Mrs. Teblum cannot rebut the Authority's showing that it would have terminated Mrs. Teblum "even in the absence" of her marriage to Mr. Teblum.   Mt. Healthy, 429 U.S. at 576.[7]

---

[7] Given that the Teblums' First Amendment claims fail on the merits, the Court need not address the Authority's argument that section 1983 liability cannot be established on these facts.   (See Doc. 34 at 18–20.)

## CONCLUSION

Nothing in this Order should be interpreted as condoning the alleged actions of the Authority and its school administrators, especially the disturbing allegations that IEPs were purportedly falsified and that students were not receiving accommodations.   But that is not for this Court to decide here.   Instead, the dispositive issue before the Court is whether the Teblums were retaliated against for exercising their First Amendment rights outside their employment duties with the Authority.

Mr. Teblum's motivation for expressing his grievances was to further his duties as a board member in ensuring compliance with the Authority's rules and regulations.   Likewise, Mrs. Teblum could not effectively carry out her responsibilities as a case manager for children requiring IEPs without reporting the violations she witnessed—also in the course of performing her work for the Authority.   Reviewing the record evidence in a light most favorable to the Teblums, it is unmistakable that their speech was unprotected given that their comments arose in their capacities as a board member and an ESE teacher.

And given the conflict that arose from that speech, the Authority's interest in maintaining harmony among the faculty at McAuliffe Elementary outweighed Mrs. Teblum's associational interest as Mr. Teblum's wife.   Finally, because Mrs. Teblum fails to rebut the Authority's showing that it would not have renewed her teaching agreement regardless of her marital relationship with Mr. Teblum, the

Authority's motion for summary judgment (Doc. 34) is **GRANTED**.   The Clerk is

**DIRECTED** to enter judgment accordingly and close the file.

   **ORDERED** at Fort Myers, Florida, on August 22, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE